

**FILED
NOVEMBER 15, 2018
In the Office of the Clerk of Court
WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.  34859-8-III (consolidated |
| Respondent, | ) | with No. 34863-6-III) |
| | ) | |
| v. | ) | |
| | ) | |
| MATTHEW SEAN MCCARTHY, | ) | |
| | ) | |
| Appellant. | ) | |
| _____ | ) | |
| IN THE MATTER OF PERSONAL | ) | PUBLISHED OPINION |
| RESTRAINT OF | ) | |
| | ) | |
| MCCARTHY | ) | |

FEARING, J. — This appeal raises the question of under what circumstances, if any, the trial court should order another competency evaluation of an accused after a jury finds the accused competent to stand trial but the accused's mental health noticeably deteriorates during later proceedings.  We follow the prevailing view, if not the Washington rule, that the court must continue to monitor the mental health of the accused and must order another mental health evaluation if a substantial change in circumstances

raises reasonable doubt as to the accused's competency. Because of the trial court's failure to abide by this principle, we reverse Matthew McCarthy's conviction for first degree burglary.

Appellant Matthew McCarthy aggressively denies any incompetency to stand trial. Nevertheless, his counsel on appeal, as did an earlier trial counsel, properly argues to the contrary. Although McCarthy promotes his competency, we still attribute his counsel's argument to him in this opinion.

FACTS

The conduct of Matthew McCarthy relevant to this appeal concerns more his behavior during the pendency of the prosecution rather than the conduct that led to the prosecution. But the alleged criminal behavior provides a setting for McCarthy's later conduct.

We start with facts transpiring before the filing of charges beginning with the medical background of Matthew McCarthy. McCarthy was born in January 1979. He ceased attending school in the tenth grade. He falsely claims that he holds a college degree. Treatment providers first diagnosed McCarthy with bipolar disorder when he was sixteen years old. Providers later diagnosed McCarthy as being bipolar with paranoid features, having an antisocial personality disorder, and as suffering from a substance use disorder. Although medication assuages his disorders, it does not alleviate

all symptoms. Before this prosecution, McCarthy amassed a lengthy criminal history that included two convictions for serious offenses.

The events directly giving rise to this prosecution began on September 21, 2014, and concern Matthew McCarthy's trespass into the home of Kayla Gonzales. On that autumn day, McCarthy had been free from his latest incarceration for only two and one half weeks.

On the morning of September 21, 2014, Matthew McCarthy drove on Mount Vernon Street in Spokane on his way to a friend's house. While driving, McCarthy noticed two cars he believed had been parked outside his home on Thor Street and found it odd that the same two cars formerly parked on his street were now parked on Mount Vernon Street. So, McCarthy stopped and knocked on the door nearest the parked vehicles. Kayla Gonzales answered the door. According to McCarthy, Gonzales looked at him as if she recognized him. McCarthy then asked for someone named Ellie. Gonzales responded that no one by that name lived at the house and began to close the door.

Matthew McCarthy grew curious about how Kayla Gonzales recognized him. According to McCarthy, he surmised that Gonzales must recognize him because she saw his face from pictures in his ex-wife, Laura's, home. McCarthy, convinced that Gonzales and Laura McCarthy were friends and that Laura was inside Gonzales' house with another man, blocked, with his arm, the front door from closing. According to

3

McCarthy, his strength overpowered Gonzales as he was able to force his way into the home. Gonzales then exclaimed: "let me get my child and leave." Report of Proceedings (RP) (Sept. 20, 2016) at 160.

According to Kayla Gonzales, when McCarthy pushed the door forward, Gonzales released her hold from the inside of the door, which release propelled McCarthy inside the home. McCarthy lost his balance and, as he flew forward inside the home, his arm struck Gonzales' shoulder which pushed her into a wall. Gonzales, who held her cell phone in her hand when she opened the door, later testified she could not remember whether McCarthy knocked the cell phone from her hand or whether the phone flew from her hand when the door swung open.

Matthew McCarthy, realizing he was inside the home, made eye contact with Kayla Gonzales and walked into the living room. Gonzales ran the opposite direction and climbed the staircase toward the bedroom where her two-year-old daughter slept. From upstairs in the bedroom with her daughter, Gonzales heard noises from downstairs as if McCarthy rummaged through the kitchen. When the noise stopped, Gonzales emerged from the bedroom. McCarthy was no longer inside the home, but he later peered through a window from the outside.

According to Kayla Gonzales, after Matthew McCarthy left the residence, she, not knowing the location of her cell phone, called police from her land line. By the arrival of law enforcement, McCarthy had left the neighborhood.

4

Matthew McCarthy returned to Kayla Gonzales' home the following evening, September 22, in search of his former wife, Laura. When McCarthy knocked on the front door, Gonzales' boyfriend, Cory Hierholzer, and his brother answered. McCarthy asked the boyfriend for Laura. The boyfriend responded that Laura was not present, and McCarthy returned to his car and left the vicinity. Gonzales inquired as to the visitor. When Hierholzer described the man, Gonzales immediately called the police.

Minutes later, Matthew McCarthy returned to Kayla Gonzales' house a third time and a second time that evening. The boyfriend stood outside. McCarthy stopped his car, rolled down his window, and asked the brother if anyone had found McCarthy's cellphone. Apparently, McCarthy had misplaced his phone. The brother fidgeted like he would attack McCarthy so McCarthy sped away. Cory Hierholzer, his brother, and a few of their friends chased McCarthy in two cars. The group pursued McCarthy to a gas station and cornered him until police arrived. Gonzales drove to the gas station and identified McCarthy as the man who entered her house the previous morning. Police arrested him.

Upon his arrest, Matthew McCarthy commented to law enforcement officers that he had not taken his medications. He refused to go to a mental health professional and instead insisted on going to jail after being informed of the charges. During interaction with law enforcement, McCarthy believed he saw people hiding behind cars, and he spoke to people not present.

5

According to jail records, Matthew McCarthy had imbibed methamphetamine, cocaine, and cannabis shortly before his arrest. Jail medical practitioners placed McCarthy on trazadone and lithium.

The following facts lack relevance to the underlying crime but assist in understanding Matthew McCarthy's assignment of error relating to falsified reports. The facts also aid in understanding McCarthy's continuing concern, during the prosecution, that law enforcement, with the assistance of others, fabricated evidence in order to house him in a mental hospital or jail. In turn, McCarthy often believed he would prevail at trial because of the falsehoods and inconsistencies in witness stories.

According to Officer Todd Belitz, he arrived at the gas station to assist other officers on September 22, 2014. Belitz asked Kayla Gonzales about the previous morning when Matthew McCarthy entered her home. Officer Belitz's report matched the testimony that Gonzales gave at trial until Gonzales saw McCarthy peeping through the windows. In Officer Belitz's report, he wrote that Gonzales called 911, found her car keys and phone minutes later, and then, while holding her daughter, exited the front door to walk to the garage in order to safely leave the home in her car.

Officer Todd Beltiz further wrote in his incident report that, after Kayla Gonzales took two steps toward the garage, she saw Matthew McCarthy sitting on the hood of a green sports utility vehicle. Gonzales and McCarthy locked eyes, and Gonzales told McCarthy that he could take whatever he wanted and she would leave the door open if

6

she and her child could leave safely. McCarthy only laughed at Gonzales. She concluded she could not leave safely, ran back inside the house, and locked the door. Officer Belitz, in his report, also declared that Gonzales remained on the phone with 911 the entire time this exchange took place. The affidavit of facts in support of charges read that Gonzales would testify that she attempted to flee in her vehicle before being stopped by McCarthy, who sat on his car laughing, and that McCarthy fled the scene in a green vehicle.

PROCEDURE

To summarize a lengthy procedure, after two psychological evaluations finding Matthew McCarthy capable of understanding legal proceedings but incapable of assisting his counsel, one psychologist determined McCarthy to be capable of assisting his attorney. Then a jury found Matthew McCarthy competent to stand trial. A later jury found McCarthy guilty of the charges. Because Matthew McCarthy argues on appeal that he lacked competence to stand trial even after the jury finding, we seek to discern why the first jury ruled McCarthy to be competent and whether his behavior changed after the jury verdict such that the court or counsel should have sought another competency evaluation. This task requires an extensive review of the prosecution's procedure.

The State of Washington charged Matthew McCarthy with first degree burglary predicated on an assault of Kayla Gonzales. The alleged assault consisted of McCarthy striking Gonzales as he entered Gonzales' residence and knocking Gonzales' cellphone

from her hand. Because of McCarthy's extensive criminal history, including two serious offenses, the State sought an exceptional sentence of life without the possibility of parole.

Because of concerns about Matthew McCarthy's competence to stand trial, the superior court did not initially arraign McCarthy. On October 2, 2014, the superior court ordered that a psychologist perform a competency evaluation of McCarthy. Psychologist Daniel Lord-Flynn performed the evaluation.

On October 29, 2014, Dr. Daniel Lord-Flynn interviewed Matthew McCarthy, then age 35, in the presence of McCarthy's appointed attorney, Kari Reardon, at the Spokane County Jail. McCarthy then lengthily discussed the legal proceedings against him. McCarthy expressed his belief that Kayla Gonzales participated, with law enforcement and his former wife, in a baroque conspiracy against him. Despite these beliefs, McCarthy acknowledged that he lacked proof of a conspiracy and the court would likely reject his allegations. McCarthy stated that he would consider his conspiracy theory's shortcomings when rendering decisions about entering a plea agreement in his prosecution.

At some unidentified date in October 2014, Matthew McCarthy sent a letter to counsel Kari Reardon, in which correspondence he complained that she looked at him, during the interview with Dr. Daniel Lord-Flynn, as if he was stupid. The correspondence also murmured that Reardon undermined him. The letter additionally exhibited a preoccupation with McCarthy's conspiracy views. Reardon forwarded the

letter to Daniel Lord-Flynn for consideration. In October and November 2014, McCarthy sent additional correspondence that complained about his counsel, and he spoke with counsel about the contriving between his former wife and Kayla Gonzales. Kari Reardon informed Lord-Flynn that McCarthy no longer accepted his lack of proof for his conspiracy beliefs and thus could not rationally address the prosecution.

Because of the correspondence from Matthew McCarthy to his counsel, Dr. Daniel Lord-Flynn scheduled a second interview with McCarthy at the Spokane County Jail for December 1, 2014. Immediately before the interview, McCarthy spoke with his attorney, Kari Reardon. During the interview, McCarthy informed Dr. Lord-Flynn that he would not answer questions because Reardon and Lord-Flynn violated the attorney-client privilege when Reardon informed Lord-Flynn about communications with McCarthy. McCarthy expressed a desire to proceed to trial on the prosecution's charges. Lord-Flynn terminated the December 1 interview.

Dr. Daniel Lord-Flynn diagnosed Matthew McCarthy with a bipolar disorder with psychotic features and with two substance abuse disorders involving alcohol and marijuana. On December 9, 2014, Daniel Lord-Flynn reported to the superior court that McCarthy understood the nature of the proceedings, but he could not make rational decisions concerning the prosecution. Therefore, according to Lord-Flynn, McCarthy lacked competency to stand trial. Lord-Flynn recommended McCarthy's admission to Eastern State Hospital for ninety days for competency restoration treatment, including

9

involuntary administration of antipsychotic drugs. On December 11, the superior court found McCarthy to lack competency to stand trial and ordered ninety days of competency restoration services for McCarthy at Eastern State Hospital. Authorities transferred McCarthy, on December 22, 2014, from jail to the hospital. The State proceeded to render a man rational so that he could spend the rest of his life in prison.

During his first stay at Eastern State Hospital, Matthew McCarthy occasionally displayed agitation, aggressiveness, and compulsiveness. He presented himself as entitled and tested the limits of hospital rules. He often spoke angrily on the phone with his legal counsel.

During his first stay at Eastern State Hospital, the hospital engaged Matthew McCarthy in competency classes. McCarthy was attentive during competency exercises and usually answered all questions correctly. He engaged in discussions following the presentation of courtroom drama videos, current event classes, and videos on mental illness. During this stay at Eastern State Hospital, he often refused his trazodone medication.

On December 14, 2014, Matthew McCarthy on his own filed a declaration in superior court. In his declaration, McCarthy averred that he did not trust legal counsel, Kari Reardon. He accused Reardon of violating his rights and claimed Reardon would continue to violate his rights if the court did not remove her from his representation.

Matthew McCarthy insisted on a second psychological evaluation because he

10

deemed Dr. Daniel Lord-Flynn to be a "hack" for the State. RP (April 24, 2015) at 5-6.
Because of the conclusions of Lord-Flynn, counsel Kari Reardon did not deem a second opinion to be currently merited. McCarthy wrote a letter to the superior court complaining of Reardon's refusal to hire an independent evaluator. As a result, on January 2, 2015, at the request of Kari Reardon, the court appointed Dr. Debra Brown to perform another evaluation.

On March 6, 2015, Dr. Daniel Lord-Flynn performed another forensic evaluation of Matthew McCarthy by interviewing him with counsel Kari Reardon and psychologist Dr. Debra Brown present. During the interview with Lord-Flynn, McCarthy complained about his attorney and refused to discuss his contention of a conspiracy against him. McCarthy claimed to have hired a new attorney, who opined that Reardon was mentally ill. McCarthy refused to disclose the name of his new attorney or the details of the attorney-client relationship.

As a result of the March 6 interview, Dr. Daniel Lord-Flynn found Matthew McCarthy as being alert and with no behaviors to suggest the presence of hallucinations or delusions. Thereafter Dr. Lord-Flynn reported to the superior court that McCarthy could now assist in his defense and was competent to stand trial because McCarthy could cooperate with his purported new lawyer. According to Lord-Flynn, any difficulty in cooperating with counsel would end with the termination of Kari Reardon's representation of McCarthy. Lord-Flynn probably assumed that the superior court would

11

appoint McCarthy new counsel and did not recognize that courts do not readily appoint accused new attorneys.

Eastern State Hospital discharged Matthew McCarthy on March 9, 2015, with the diagnoses of manic bipolar disorder in early remission, substance abuse in remission because of a controlled environment, and antisocial personality disorder. The hospital gave him a prescription of lithium carbonate. McCarthy returned to the Spokane County jail.

On March 12, 2015, Dr. Debra Brown interviewed Matthew McCarthy alone at the Spokane County Jail. McCarthy explained to Brown that the State charged him with first degree burglary and sought lifetime imprisonment because of his third serious offense. McCarthy again complained about the performance of his counsel, Kari Reardon, and of Dr. Daniel Lord-Flynn. McCarthy bespoke: "'It is an adversarial system but my biggest adversary is my attorney.'" Clerk's Papers (CP) at 166. McCarthy commented that he refused to explain himself to Dr. Lord-Flynn because of his disregard for Lord-Flynn. Brown ended the interview when McCarthy remarked: "'Kari [Reardon] seems to think that she is the one that is trying to run my case and has forgotten who the boss is—ME!'" CP at 166. In addition to interviewing McCarthy, Brown reviewed extensive psychological records of McCarthy.

On March 17, 2015, Matthew McCarthy submitted a grievance, with the Washington State Bar Association Office of Disciplinary Counsel, against Kari Reardon.

12

The grievance accused Reardon of violating the attorney-client privilege, uttering

prevarications, and ignoring his requests. The Office of Disciplinary Counsel declined to

bring charges against counsel Reardon.

On April 5, 2015, Dr. Debra Brown submitted her report to the superior court.

Brown diagnosed McCarthy with hypomanic bipolar disorder with paranoid features,

antisocial personality disorder, and substance abuse disorder in institutional remission.

She concluded, contrary to Dr. Daniel Lord-Flynn, that McCarthy lacked the present

ability to rationally assist in his defense. She noted that McCarthy had changed little

since Lord-Flynn concluded, in December 2014, that McCarthy could not assist his

attorney. Since that evaluation, McCarthy had continued to demonstrate symptoms of

grandiosity, distrust, and paranoia. He continued to falsely blame his attorney for his

misfortunes and to wrongly accuse her of working in favor of the prosecution.

DeAnna Cornell, an investigator hired by Kari Reardon, accompanied Reardon to

the Spokane County Jail on April 17, 2015, to visit Matthew McCarthy. Cornell later

signed an affidavit describing McCarthy's behavior during the visit. According to

Cornell, McCarthy could not focus on the conversation even when redirected. He spoke

incessantly about his ex-wife. He spoke "over" attorney Reardon. CP at 1524. He

refused to sit, his eyes bugged out, and he laughed at inappropriate times.

13

Because of the competing evaluations of Dr. Debra Brown and Dr. Daniel Lord-Flynn, the superior court conducted a contested hearing, on April 24, 2015, as to Matthew McCarthy's competency to stand trial. The superior court reviewed the reports of Debra Brown and Daniel Lord-Flynn rather than entertaining live testimony. Kari Reardon represented McCarthy at the hearing. McCarthy's counsel noted that McCarthy understood the nature of the proceedings, but he could not assist his lawyer. Reardon mentioned the State simply characterized the difficulty between McCarthy and her as McCarthy disliking Reardon. According to Reardon, the State's position did not recognize the seriousness of the discord between McCarthy and his counsel. McCarthy genuinely believed that Reardon had joined the conspiracy against him and worked together with the prosecution to harm him. Reardon commented that she represented McCarthy on charges brought in 2010 and 2013, and she encountered no difficulty with assisting him on the earlier occasions. She concluded that McCarthy's bipolarism had overcome his ability to rid himself of paranoiac delusions.

In response, the prosecution praised Kari Reardon's abilities as an attorney and characterized her as "strong-willed." RP (April 24, 2015) at 12. According to the prosecution, Matthew McCarthy also carried a strong will such that the client and his counsel may only have a personality conflict. According to the State, the superior court should appoint McCarthy a new attorney rather than declare him incompetent.

14

During the April 24 hearing, Matthew McCarthy called his counsel a "maggot."

CP at 461. Because of verbal abuse from McCarthy, three court officers surrounded Kari

Reardon to protect her.

At the conclusion of the April 24, 2015 hearing, the superior court ruled that

Matthew McCarthy lacked competency to assist his defense attorney and to stand trial.

The court noted that counsel Kari Reardon and Matthew McCarthy enjoyed a good

relationship in earlier years such that a personality conflict did not explain the obstacles

between counsel and client. The superior court ordered another ninety-day placement

with Eastern State Hospital, during which McCarthy would receive additional

competency restoration services.

During his second residency at Eastern State Hospital, Matthew McCarthy

generally behaved appropriately and communicated effectively. Nevertheless, McCarthy

occasionally intimidated and cursed staff. Dr. Daniel Lord-Flynn attributed the

occasional misbehavior to McCarthy's antisocial personality disorder, not to a major

mental illness. According to Lord-Flynn, medications ended McCarthy's delusions such

that McCarthy's treating psychiatrist questioned whether McCarthy still suffered from

bipolar disorder. McCarthy regularly attended competency restoration classes but

learned nothing new beyond what he learned in earlier classes. McCarthy already

understood the legal process. McCarthy continued to complain to hospital staff about

counsel, Kari Reardon. He told staff that he considered representing himself in the prosecution, but he hoped the court would assign him other counsel.

On October 4, 2015, Dr. Daniel Lord-Flynn interviewed Matthew McCarthy again at Eastern State Hospital. Dr. Debra Brown, counsel Kari Reardon, and two psychologists from the hospital attended the clinical interview. In addition to interviewing McCarthy, Daniel Lord-Flynn reviewed Eastern State Hospital charts, documents delivered to Lord-Flynn by McCarthy, and letters written by McCarthy. During the interview, McCarthy correctly answered that the prosecution would need to prove that he entered a home without permission and assaulted someone inside the home in order to convict him of first degree burglary. McCarthy expressed happiness that the trial court ordered the second ninety-day residency at Eastern State Hospital because he knew that, after two deferments of the prosecution because of incompetency, the accused was entitled to a jury trial on his competency. McCarthy looked forward to testifying at a jury trial. McCarthy also thought he might win his prosecution because of inconsistent statements from Kayla Gonzales and her boyfriend. McCarthy surmised that he might not even need to testify to win because of the inconsistent statements.

During the October 4 interview, Matthew McCarthy announced to Dr. Daniel Lord-Flynn that his relationship with Kari Reardon had ended. McCarthy stated that he paid an attorney $500, although the attorney demanded another $6,000 to represent him. McCarthy also indicated he probably would not hire the attorney. He hoped the public

16

defender's office would assign a new attorney. Kari Reardon mentioned that the new

director of the public defender's office did not assign new attorneys when the client

declined representation from the first assigned attorney. McCarthy conceded that

representing himself would constitute a bad decision and that he would rely on Reardon

as his counsel if the public defender's office refused to assign another lawyer.

Nevertheless, if Reardon continued to represent him, he would seek a plea agreement

because he would not trust her to conduct a trial. Daniel Lord-Flynn attributed

McCarthy's difficult relationship with Reardon to McCarthy's antisocial personality

disorder not to a bipolar disorder.

On October 14, 2015, Dr. Daniel Lord-Flynn reported again to the superior court

that Matthew McCarthy understood the criminal proceedings against him and held the

capacity to assist in his defense. Lord-Flynn mentioned, however, that McCarthy might

choose not to utilize his capacity to assist his counsel. Dr. Debra Brown, in a separate

report to the superior court, continued to opine that McCarthy could not assist his counsel

because of his conspiracy beliefs.

Matthew McCarthy personally continued to insist on his competency, but, through

counsel, opposed Dr. Daniel Lord-Flynn's finding of competency to stand trial.

McCarthy demanded a jury trial on his competency. A jury trial proceeded on January

25, 2016, before a superior court judge other than the judge who earlier ruled Matthew

17

McCarthy to remain incompetent. Kari Reardon represented McCarthy during the competency trial.

During the competency trial, Matthew McCarthy declared "absolutely" his competency to stand trial. RP (Jan. 26, 2016) at 347. He testified about his mental health and disclosed how his behavior and interactions become chaotic when he fails to take medication. McCarthy commented that his working relationship with his attorney, Kari Reardon, ended when he learned that Reardon betrayed him by disclosing private communications to Dr. Daniel Lord-Flynn. McCarthy also complained about Reardon's failure to forward him requested records. McCarthy pledged to work with another attorney, if the court appointed a substitute attorney.

During his testimony, Matthew McCarthy noted that Dr. Daniel Lord-Flynn initially opined to McCarthy's competency to stand trial. McCarthy took exception to Daniel Lord-Flynn changing his opinion after Kari Reardon shared correspondence that McCarthy sent Reardon. He felt betrayed by Reardon.

During the jury trial, Matthew McCarthy expressed displeasure toward Dr. Debra Brown. According to McCarthy, Dr. Brown, during her second evaluation of McCarthy, told him that she would instruct Kari Reardon to withdraw from representation of McCarthy so that McCarthy could proceed to trial on the criminal charges. But three weeks later Brown wrote a report that declared him incompetent.

18

Following Matthew McCarthy's testimony, Dr. Debra Brown and Dr. Daniel Lord-Flynn respectively testified to their observations of and opinions concerning McCarthy. The two psychologists concurred on diagnoses for McCarthy of bipolar disorder with paranoid features, antisocial personality disorder, and a substance use disorder. Both psychologists agreed that McCarthy understood the legal process, but the two disagreed as to McCarthy's ability to assist counsel.

Both psychologists Debra Brown and Daniel Lord-Flynn explained for the jury the difference between bizarre delusions and nonbizarre delusion. A bizarre delusion entails an impossible belief, such as aliens implanting transmitters in one's brain. A nonbizarre delusion involves a possible, but untrue, belief. Matthew McCarthy had held only nonbizarre delusions since Kayla Gonzales and Laura McCarthy could possibly know one another and conspire to place him in jail.

Dr. Debra Brown told the jury that Matthew McCarthy was not rational and could not assist in his defense. Brown testified that Matthew McCarthy insisted that Kayla Gonzales and his ex-wife were friends. McCarthy also insisted that DeAnna Cornell, Kari Reardon's investigator, was a male, but, according to Brown, Cornell was definitively a female. McCarthy believed he never violated the law. Although medication helped to treat the paranoia, the medication did not alleviate all symptoms. Brown denied telling Matthew McCarthy that she would advise Kari Reardon to withdraw from representing McCarthy so that he could proceed to trial on the criminal

19

charges.

Dr. Debra Brown explained that Matthew McCarthy believed that his attorney, his former wife, Laura, and Kayla Gonzales all conspired in his arrest and in trying to convict him. According to Brown, these beliefs demonstrated paranoid delusions. McCarthy considered all individuals who did not concur with his conspiracy beliefs to abet in the conspiracy.

Dr. Daniel Lord-Flynn believed that Matthew McCarthy would be able to cooperate with new counsel if the superior court ordered an attorney to represent McCarthy other than Kari Reardon. Dr. Debra Brown testified to the consequences of appointing Matthew McCarthy counsel other than Reardon:

> Q  Now, you're aware that during one of the evaluations Mr. McCarthy indicated that he was—he had made a $500 down payment to retain another attorney?
> A  Yes.  Yes.
> Q  Okay.  And then did he subsequently indicate that that attorney could not be trusted and so he wasn't going to do that?
> A  Yes.  And that the attorney had spent the money and that the attorney had divulged information, I believe to you, and there was—there was some wrongdoing that was occurring there, too.  He wouldn't tell anybody who that attorney was because—I don't know.  I don't know why he didn't trust any of us in the evaluation.
> Q  Mr. McCarthy's indicated that he'll be perfectly okay if he can just have a different attorney.  In your professional opinion is that true or an accurate assessment?
> A  In my opinion it's not.
> Q  Why not?
> A  Because his story doesn't make any sense.  He's delusional and using a delusional defense.  No matter who your attorney is isn't going to work.

Q  Is this a choice Mr. McCarthy's simply making?

A  Nobody chooses to be mentally ill.

Q  Does Mr.—now you heard Mr. McCarthy say on the stand today that he recognizes that he has bipolar disorder.  In the records you reviewed and the various things that he has filed, does Mr. McCarthy appear to have a great deal of insight into his mental illness?

A  I haven't seen anything.

Q  Did he express in the evaluations with Mr.—with Dr. Lord-Flynn that he was very upset that I had questioned his competence at all?

A  Yes, he was very upset.

RP (Jan. 27, 2016) at 407-08.

During his testimony at the jury trial, Dr. Daniel Lord-Flynn disagreed with Dr. Debra Brown's opinion that Matthew McCarthy could not assist his counsel.  Lord-Flynn noted that McCarthy is intelligent, well read, and able to rationalize different legal options and understand the consequences of those options.  McCarthy excelled in legal classes at the mental hospital and understood the legal process better than other members of the classes.

Dr. Daniel Lord-Flynn testified that, at the conclusion of Matthew McCarthy's second restoration treatment, McCarthy acted calmly.  He slept and ate well contrary to one suffering from bipolar disorder.  According to Daniel Lord-Flynn, the treating psychiatrist, during the second restoration period, found no symptoms of bipolar disorder.  Toward the end of the second restoration period, treatment providers did not record delusional behavior or statements of McCarthy.  During questioning by the State's counsel, Dr. Lord-Flynn averred:

21

Q  And there was nothing out of the ordinary, maybe some disputes with some other folks within the hospital but you attributed that to more likely antisocial personality disorder but not any delusions or paranoia going on at that time, correct?

A  True.  That's my impression.

. . . .

Q  . . . So did anybody in that second competency evaluation make any notations of any delusions that they were seeing with Mr. McCarthy?

A  I am not aware of anybody indicating a likelihood of seeing delusions or delusional types of behavior or hearing delusional statements or things of that sort.

There were a lot of observations again regarding being upset with his attorney and things of that sort.

RP (Jan. 28, 2016) at 555-56.

Dr. Daniel Lord-Flynn added:

Q  . . .  Doctor, how did the evaluation [that occurred the day before Daniel Lord-Flynn's jury trial testimony] begin?

A  . . .  You may recall when he [Matthew McCarthy] was testifying yesterday [to the jury], no coarse language.  He was very careful in his choice of words and very controlled in how he was presenting himself.

People who are having a hypomanic or even a manic episode, if they are on their way up they will not have that degree of control.  So that again tells me that even as recently as when I was seeing him yesterday symptoms are under really good control.

RP (Jan. 28, 2016) at 560-61.

Dr. Daniel Lord-Flynn characterized Matthew McCarthy's friction with legal counsel as based on McCarthy's antisocial personality and need to control the defense or the prosecution, not on any paranoia or inability to assist his lawyer.  According to Lord-Flynn, McCarthy was competent to stand trial.

The State, during summation, asked the jury to find Matthew McCarthy competent

22

to stand trial. The State commented, in light of Dr. Daniel Lord-Flynn's testimony, that

treatment restored McCarthy such that his delusions lay in the past:

> So, again, we're not looking at back then. We're looking at right now. What is going on right now and is Mr. McCarthy competent to proceed to trial in this matter and have that dealt with in the criminal context, because this is the civil context.
> . . . .
> . . . He had some delusions. He had some paranoia.
> . . . .
> Unmanageable behavior. Does he seem unmanageable as he sits here in the courtroom today?
> . . . .
> . . . These are the factors of considering, the doctors are considering in making their opinion and formulating their opinion and the opinion is that he's competent, that he has been restored to competency.
> . . . .
> And he [Matthew McCarthy] took the witness stand and he testified upon cross-examination and he told you that he is competent. He understands he has an issue. He's been on his meds now. He's very stable. He feels pretty good. He knows he has issues, but that he is competent and he wants to proceed and he certainly knows what he is facing.

RP (Jan. 28, 2016) at 674, 680-83.

On January 28, 2016, the jury found Matthew McCarthy competent to stand trial.

After the jury returned its verdict of competency, the superior court authorized the

withdrawal of Kari Reardon and substitution of other counsel. Reardon's zealous

advocacy ended.

On January 28, 2016, the superior court arraigned Matthew McCarthy on the first

degree burglary charge, to which he pled not guilty, and the superior court appointed him

new counsel, Dennis Dressler. The superior court scheduled the prosecution for trial.

23

On April 8, 2016, more than two months later, Matthew McCarthy wrote a letter to counsel Dennis Dressler. He wrote that jail officers planted another inmate in the jail for the purpose of supplying him narcotics. Jail officials also planted his former wife's boyfriend as his cellmate. We do not know if the two plants were the same person. McCarthy further contended that his former wife worked in the jail mailroom. The jail hired her to keep her close to the prosecution such that she would not leave the conspiracy. According to McCarthy, Laura, his former wife, intercepted his correspondence to a material witness in the case. In the letter, McCarthy directed Dressler to obtain, among other documents, a Department of Licensing photograph of Kayla Gonzales, a picture of the vehicle owned or driven by Gonzales, a bail bond contract, a Quality Inn Kennewick receipt for his former wife, and a handwriting analysis of correspondence from his father.

On April 12, 2016, Matthew McCarthy applied to the superior court to discharge Dennis Dressler and to represent himself. For an unknown reason, McCarthy refiled a similar motion dated April 24, 2016.

On April 21, 2016, Matthew McCarthy filed a motion to dismiss, in which he claimed the State's charging information to be insufficient. He argued that Kayla Gonzales agreed that he never struck her. Instead, the door pushed her. He added: "It could not be reasonably believed that my sole intent was to assault Ms. [Gonzales] with a door." CP at 831. Therefore, according to McCarthy, the State could not prove any

24

intent to assault, an element of first degree burglary. McCarthy's motion also focused on Kayla Gonzales' child being asleep at the time of his approach of the house on September 21, 2014.

On May 13, 2016, the superior court entertained Matthew McCarthy's motion to represent himself. The same judge who presided over the competency jury trial presided over the May 13 hearing. McCarthy argued his motion to proceed pro se, but he added that he wanted standby counsel, other than Dennis Dressler, to register objections to evidence and question some witnesses. The superior court responded that McCarthy could not choose who he desired as standby counsel and the court would appoint Dressler if the court granted the motion to proceed without counsel. The court also warned McCarthy that standby counsel would not register evidentiary objections or examine witnesses. McCarthy responded that he still wished to proceed pro se.

During the May 13 hearing, the superior court granted McCarthy's wish to represent himself, and the court appointed Dressler as standby counsel. Thereafter McCarthy withdrew his motion to challenge the charging information.

During the May 13 hearing, Matthew McCarthy expressed a belief that correctional officers subjected him to harassment. After the court granted McCarthy's motion to proceed with legal representation, the State expressed concern about McCarthy undergoing delusions again. The prosecution mentioned pleadings in which McCarthy stated his ex-wife worked in the jail mailroom and intercepted his mail and county

officials placed a human plant in his jail cell to provide him narcotics. The prosecution summarized:

> I don't know what his medications are, if he's on his medications that stabilize him. But it does create some concern from the State's perspective having sat in on the competency trial and having a jury decide that he's capable of moving forward and he's competent, but—but, again, *it seems like we're slipping a little bit here since that time.*

RP (May 13, 2016) at 715-16 (emphasis added).

The following colloquy then occurred between the trial court and Matthew McCarthy, during the May 13 hearing:

> THE COURT: . . . You don't need to respond to that, Mr. McCarthy. I understand the State's concern. We went through a whole competency trial. You were found to be competent. In listening to you today, you don't sound a whole lot different than you did at the competency trial. You seem to understand the process, the procedure, where you are in this case, and it seems that you have some defense. Whether or not it's a defense that other people would choose is a separate question.
> *I think what we'll do is have you come back to check on you, though, to make sure you're doing okay. If there does appear to be issues of competency, then we might have to start this whole thing over again.*
> THE DEFENDANT: Okay. Well—I mean, may I respond, Your Honor?
> THE COURT: Yes.
> THE DEFENDANT: I actually have my medical file since October 6th. It has come to my attention that—that 2015—okay. In 2015, from January to October, my lithium levels, which is I take lithium for bipolar, my lithium levels varied by a mere .01, from .87 to .88. Coinciding with my competency trial from when I got back to jail in October 6th to the current time, which I also have—my medications has been administered and levels and everything as such, I had not taken my medication for instance—four instances, on 3/28, 3/30, 3/31, and 4/20.
> January 12th—January 12th, March 11th, and May 3rd, May 3rd most recently, I had a lithium level of .7, 0.7.

26

.87, .88 is my sweet spot. That's where I operate the best. That's where I felt most comfortable. And I continually kited medical because I was feeling off. And this was about my competency trial. This is around this time. And, like I said, 2015 it varied by a mere .01. In January it was .6. In March it was .5. And most recently it was .7. *This variation, and with me still taking the same medication that I was the whole time, speaks volumes.*

I'm in the most controlled situation that I could be in. I eat the same meal every other week. I take the same medication at the same time. I'm doing the same things I do day in and day out. So for the fact that the—for the fact that it was—for the fact it was up and down like it was makes me question what exactly was going on. And for it to coincide with my competency trial makes me wonder even more.

I have claimed governmental misconduct since the start. On 3/28— on March 28th I was assaulted by another inmate. He had a weapon. I have come to understand that it's quite possible he wasn't even an inmate because he's disappeared. Even though I can't see him because I'm on 6 West now, you still talk to people throughout the jail and this person is not there anymore.

What is a non-bizarre delusions? What did DOC Lord-Flynn say? Oh, it could be true but it's not. It sounds like an opinion to me.

You have an opinion. You could be wrong. I'm not saying that I'm totally correct. What I'm saying is quite possible and any reasonable person would see that there's an issue and something going on here.

As far as the State's concerned, I'm ready to proceed.

THE COURT: Thank you, sir. At this point we'll hold it ready for trial having resolved these issues. And what I'll do is, Mr. McCarthy, I'll have you brought back at a later date. We'll set that date at a later time. I need to look at my calendar and find a time. *But we'll probably bring you back to check on you and make sure you're progressing and preparing your defense and see if there's anything that you need.*

RP (May 13, 2016) at 716-18 (emphasis added). The judge presiding over the May 13

hearing never presided over another hearing in McCarthy's prosecution.

On May 20, 2016, seven days after the superior court approved Matthew

McCarthy's representing himself, McCarthy filed a motion for an ex parte emergency

injunction requiring jail officials to take a urine sample from him and conduct urinalyses on the sample every two weeks. McCarthy claimed that jail officers involuntarily "intoxicated him" such that his jail cell "is virtually a gas chamber." CP at 1060. He also claimed that the jail denied him his medications.

In addition to the motion for an injunction, Matthew McCarthy filed, on May 16, another motion to dismiss the prosecution because of government misconduct. The alleged misconduct was the government's toxification of his jail cell and the refusal to provide medications. McCarthy mentioned that his ex-wife Laura sent him a letter with deliberate misspellings that mimicked the name of the victim, Kayla Gonzales.

Matthew McCarthy attached voluminous medical records, including jail medical records, to his May 16 motion to dismiss based on government misconduct. In a medical request form attached to the motion, McCarthy mentioned a recent week-long depression, during which he could not function. McCarthy described sliding between bipolar opposites with no stability. He complained of his medication not being effective and emphasized that he needed an increased dose of lithium to stabilize him. If he did not receive an increased dose, he threatened to stop taking all medications.

In a supplemental brief in support of his motion to dismiss, Matthew McCarthy highlighted purported factual inconsistencies between the arresting law enforcement officer's affidavit in support of probable cause and his incident report. He also emphasized differences between the facts reported by Kayla Gonzales to law

enforcement officers from the facts to which she testified in an affidavit in support of an antiharassment order of protection.

In other pleadings filed after May 13, Matthew McCarthy informed the superior court that, as soon as the court authorized him to represent himself, jailers sought to physically harm him. McCarthy described how, for the last month and a half, he had been exposed to varying toxic fumes. At first, he thought officers had poisoned his food, but then noticed a smell in his cell. McCarthy described one instance when the jail's sergeant came to his cell, under the pretense to discuss grievances he had filed. According to McCarthy, toxic fumes permeated his cell and destroyed his cognitive skills.

In a June 6, 2016 inmate grievance, Matthew McCarthy repeated the complaint of toxification he documented in earlier pleadings. McCarthy complained that a corrections officer entered his cell during the last week. Suddenly fumes enveloped his cell. The fumes impeded McCarthy's reading and other cognitive functions. When the corrections officer left the cell, he joined one of McCarthy's arresting officers, and the two laughed.

Matthew McCarthy filed another grievance with the Spokane County Jail that complained about the environment in a booth, to which a corrections officer assigned him for purposes of reading police reports. According to McCarthy, a vent connected the reading booth with a staff bathroom. Once inside the booth, McCarthy smelled the same

toxic fumes he smelled in his cell. McCarthy complained that the continued chemical attacks prevented his preparation of a defense.

On June 6, 2016, Matthew McCarthy filed a petition for writ of habeas corpus with the superior court. He asked for dismissal of the prosecution because of shocking government misconduct. He claimed that law enforcement and his family conspired to create a crime that he never committed. According to McCarthy, one law enforcement officer stalked him in the course of the creation of the crime. He claimed the State had expected a finding of incompetency that attorney Kari Reardon failed to deliver on its behalf. Jail officials conspired to harm his mental health by withholding medications. Another inmate, at staff direction, attacked him. The State had failed to afford him effective assistance of counsel. He ended the petition:

> I am under constant abuse from my jailers trying to disqualify me from the criminal judicial process making the court's timeline unattainable.

CP at 1373.

On June 24, 2016, the superior court presided over another hearing to entertain Matthew McCarthy's motion to dismiss and to conduct a status conference. The judge presiding over the June 24 hearing was different from the judge presiding over the competency trial and the May 13 motion to proceed pro se. The superior court granted McCarthy a postponement of the July 11 trial date. McCarthy then commented:

> MR. MCCARTHY: And that's the thing. Um, on May 13th when I went pro se, Judge Cooney's court said they were going to bring me back

30

> within two weeks, see how I was doing. And at the time—
>
> THE COURT: To see how you were doing?
>
> MR. MCCARTHY: Yes, yes, and said that—and that's kind of odd in itself. But there has been a mental health angle involved in this case. But at that time, he—he—on May 13th he put himself pretty much in a supervisory role as far as bringing me back to see what my subpoenas were going to be and—and who I was going to be calling for my witnesses or—

RP (June 24, 2016) at 7.

During the June 24 hearing, Matthew McCarthy complained about Dennis Dressler's purported failure to subpoena witnesses. After some inquiry, the superior court discerned that McCarthy wanted witnesses subpoenaed for that day's hearing for purposes of his motion to dismiss. McCarthy explained to the superior court that he needed proof, including documents, to win his motion to dismiss. Dennis Dressler then reported to the court that the previous judge had not directed him to assist with subpoenas. Nonetheless, Dressler had prepared subpoenas and earlier forwarded them to McCarthy for his use. McCarthy complained that the subpoenas prepared by Dressler were for purposes of the trial, not for purposes of his motion to dismiss.

Matthew McCarthy next addressed the superior court, during the June 24 hearing, about the alleged abuse from correction officers:

> MR. MCCARTHY: Your Honor, there—there have been extreme abuse at the hands of correctional officers. They're alleged—there's several—there's several that have been alleged in my—in my initial motion to dismiss. There's also been an angle of medical misconduct. And—well, there have been three serious incidents in addition to just the—the—the daily—just, I don't know, whatever I've been—on May 14th, the day after I went pro se.

31

THE COURT: Well, let me ask you before you go any further, what is it—before you describe all of this, who is this motion directed at?

. . . .

MR. MCCARTHY: See—see—and—and I don't know. See, that's the thing, because Spokane County Detention Services does what they want.

THE COURT: But tell me, what is it—are you seeking me to order them to do something? [B]ecause if you are, they need to be made a party to this motion, right? [S]o that they can come in here and explain to me—

MR. MCCARTHY: Right.

THE COURT:—what their side of the story is.

. . . .

MR. MCCARTHY: Yeah. And, see, that's—and that's the thing. It's like—I mean, this is brilliant. I've been, you know, diagnosed with a mental health illness; they said I'm—have—I'm delusional with, you know—or I'm bipolar with nonbizarre delusions. Your Honor, on May 14th, the day after I went pro se, the officers that—that work that floor, which is fine; they're officers in the jail; they can work wherever they want. But it's not a coincidence that four of them that were working that day were listed in my complaint.

I'm eating dinner. At first I thought it was in my food but then a toxic smell in my cell and I'm extremely hot. I panicked. That's where the injunction came from, filed that day, because I didn't know what to do. And I know testimony and weight, the court gives a certain weight to testimony and evidence for anything. In 14 years we don't have a Washington State Department of Corrections officer can say I asked for a urinalysis. I'm not being—I'm not being smart; I'm being totally truthful. I didn't know what to do. I was up for two days.

During the intervening time, there were other instances where it was bizarre chemical smells in my—in my cell. And that's the thing: Let's abuse him away and dare him to say something about it; he's bipolar; he has issues; he's saying that there's—we're gassing him; it's great.

On May—on May 31st—Mr. Kane came and dropped off my discovery on May 27th. It was made available to me on May 31st. Sergeant Bliven and Sergeant Hill came up to see me on 6—6-West on May 31st in the morning. Sergeant Hill came into my cell under the pretense of discussing some grievances that I filed. While he's in my cell, a vapor came over me and my cognitive skills were destroyed. I could barely talk. I didn't know what was going on. The way he was sitting there

32

looking at me, he was—he was observing me. When they left, when he left my cell I went to look out the cell door. They were out there having a nice laugh.

Later that afternoon when I requested to see my discovery, when I requested to see my discovery, the floor officer put me in—in booth 1. She told me to take a chair with me. This is the first time since 2014 that I could see all the documents that were related to my case. You know, "You might be in there a while, take a chair, get comfortable." When I'm looking at the documents, the same smell, the same vapor came over me. And when I say the cognitive skills ceased, I almost passed out. I was in there for maybe a minute, two minutes. Needless to say that I haven't asked to see my discovery since.

Your Honor, I don't know what to do. As far as—as far as housing situations, previously in March I was set upon by a—an inmate, an inmate with a weapon. When I asked for medical attention, I didn't get it. An incident on 6-West—since that incident I got a little gun-shy. I don't want confrontation. I have so much stuff going on that I just want to be let—be able to—to take care of my case, to handle my case.

So—so with all that being said, when I first wrote the—you know, the—the motion governing Spokane County Detention Services, you know, Directive, at first I was—I was—I was looking for an order to be housed in a certain place or—but at the same—at the same time it doesn't really matter. I mean, if they're—if they're bent on disrupting this case, then it—then it doesn't matter where I'm at. So I really don't know what to do.

THE COURT: What are you asking me to do?

MR. MCCARTHY: I don't know. And at this point, like I said, when I filed it I was hoping that they would be able to—you'd be able to interject, the Court would be able to interject themselves in—in the form of a directive and having me in someplace that's safe.

THE COURT: Okay.

MR. MCCARTHY: But it doesn't—it really doesn't matter. I mean, I don't—I don't know what to do now.

THE COURT: Okay. So, as I said—and I don't know if you're finished yet. But I think that the issue here is that whenever you bring a motion—and I don't know what the answer is either, but somebody from detention services or their counsel need to be here to respond to your allegations.

MR. MCCARTHY: Right.

THE COURT: So what I would like to do—and I don't know what

the answer is. What I'd like to do is simply not make a decision on this today, we'll reset this motion, and we'll—you'll need to serve somebody from detention services.

. . . .

MR. MCCARTHY: And like I said, I—at first I—you know what I'm saying? I didn't know how to respond to it. I panicked.

THE COURT: Has this happened since then?

MR. MCCARTHY: This has—this has been—this has been—as far as—as far as being—my cell has been a horrible likeness to a gas chamber for the last month and a half.

THE COURT: Okay.

MR. MCCARTHY: And it's been—it's not been the same toxic smell.

THE COURT: All right.

MR. MCCARTHY: I mean, a couple weeks ago it was a fuel smell like propane or something.

RP (June 24, 2016) at 27-33. The superior court also postponed Matthew McCarthy's pending motion to dismiss.

The superior court conducted another hearing on July 1, 2016, to address Matthew McCarthy's concerns about the Spokane County Detention Center. McCarthy repeated his claim of harassment in the jail, which agitation prevented his preparing his defense for trial. McCarthy asserted that another inmate with a weapon assaulted him on March 28. When the injury swelled the following day, McCarthy asked corrections officers for medical treatment, but the officers denied his request. McCarthy mentioned that the jail placed him in a segregation unit two days later. In turn, corrections officials placed another inmate in the cell for purposes of providing McCarthy narcotics. While in the segregation unit, McCarthy again asked for medical attention. A nurse examined him but

provided no treatment.

During the July 1, 2016 hearing, Matthew McCarthy continued that the jail transferred him to a new section on April 4. On that same day, he noticed toxic smells in his new cell. Since May 14, the jail constantly fed gas into McCarthy's cell. McCarthy mentioned that the smell, similar to his earlier use of illicit drugs, prevented him from sleep for two to three days. The superior court declined ruling for the day to allow Spokane County Detention Services an opportunity to investigate and respond to Matthew McCarthy's assertions now that the detention officials heard of the complaint.

In response to Matthew McCarthy's motion to dismiss and petition for writ of habeas corpus, Ron Oscarson, Spokane County director of facilities, filed a certificate under penalty of perjury. Oscarson averred that no toxic fumes entered McCarthy's cell through the jail's heating and ventilation system. John McGrath, Spokane County director of detention services, signed a certificate, in which he declared that officers entered McCarthy's jail cell and smelled no fumes. McGrath added that no other inmates or corrections officers complained of toxic fumes.

During a July 15, 2016, hearing, the superior court and Matthew McCarthy discussed the witnesses McCarthy sought to subpoena. McCarthy claimed a witness would testify to Kayla Gonzales and his ex-wife knowing one another. McCarthy expressed concern that his ex-wife and Kayla Gonzales engaged in a romantic relationship. According to McCarthy, the two conspired to isolate him in jail. He stated

35

that his defense was that the two worked to get him off the street because he was a threat

to the community.

During the July 15 hearing, the State commented that Kayla Gonzales never met

Matthew McCarthy's ex-wife. The State added:

> Mr. McCarthy has this belief that these women know each other
> even though Ms. Gonzales says, "I don't know who Laura McCarthy is."
> Supposedly there's a picture that he provided and had an investigator look
> at saying that in the back—in the background of this picture of Mr.
> McCarthy and Laura McCarthy there's alleged scribbling on a wall or
> poster or something that says "KK lies"; and then Mr. McCarthy believes
> that Kayla Gonzales goes by "KK."

RP (July 15, 2016) at 66-67. No one then questioned McCarthy's competency.

On July 15, the trial court entertained Matthew McCarthy's motion to dismiss.

Matthew McCarthy essentially argued that the court should dismiss the charges because

of government misconduct in misrepresenting facts in affidavits. The superior court

noted, however, that it was not certain about what McCarthy argued. The superior court

denied the motion to dismiss.

After the superior court dismissed Matthew McCarthy's motion to dismiss,

McCarthy mentioned his pending petition for writ of habeas corpus. The superior court

noted that the State had filed affidavits disputing McCarthy's claim that prison officials

engaged in perfuming his cell with toxic fumes. The court asked McCarthy if he desired

time to review the affidavits. McCarthy replied affirmatively and the court postponed the

hearing on the petition for a writ. The record does not show any later hearing on the

36

petition for a writ of habeas corpus.

After postponement of the hearing on the application for a writ of habeas corpus, the following colloquy then occurred between the superior court and Matthew McCarthy, on July 15, in which colloquy the prosecution later joined. The superior court expressed concern that McCarthy represented himself while facing a penalty of life imprisonment.

> MR. CRUZ [State's attorney]: Your Honor, could I put a couple things on the record on that point?
> THE COURT: Please do.
> MR. CRUZ: When Mr. Dressler was the appointed counsel for Mr. McCarthy, I did—I had staffed this issue with my superiors. I got authorization to make an offer on this particular case. Mr. McCarthy rejected that. It was an assault 3 [which would significantly reduce the sentence]. He rejected that just outright.
> THE COURT: What's the—the sentence range? Maximum is five years.
> MR. CRUZ: Correct. So—and that was discussed with Mr. Dressler.
> Two, I think it's—I don't know Mr. McCarthy other than when I've dealt with him through this process unfortunately. I could tell the Court from the competency trial that one of the issues that Dr. Lord-Flynn had indicated and testified to is what he described as non-bizarre delusions. And as he explained it, as I understood it, it is could a situation certainly happen? Certainly. Could there be fumes coming into his cell? That's possible. But is it happening? According to the information that was provided to the court, that is not the case.
> I—I don't know him well enough to say if there's a slippage going on. But I know that from the materials that he provided regarding lithium dosage, they were giving him a therapeutic amount; he requested that it be upped; that they complied with that request because it was constant, a request. So. . .
> MR. MCCARTHY: That's—
> MR. CRUZ: And then—and then just with respect to the witnesses, I asked Mr. McCarthy to provide the sum and substance of what his witnesses would testify. And the response on a letter that's dated June

37

16th, 2016 was "Your guess is as good as mine."

THE COURT: Quite frankly, I suspect that Mr. Cruz might be asking me to maybe disallow some of these witnesses because of irrelevance. I don't know this yet. You know, I want you to understand that I don't take Mr. Cruz's comments as an attack on you by any means, and I'm not trying to do that either. My—my role up here is to make sure that you get a fair trial. And with the penalties you're looking at—

MR. MCCARTHY: And I—

THE COURT:—it's so significant—

MR. MCCARTHY: Mm-hm.

THE COURT:—that I am gravely concerned.

MR. MCCARTHY: I thank you for your concern.

THE COURT: And I think—and I take Mr. Cruz's comments as basically saying—and you will acknowledge and I can see from the documents that you've given me that you are on medication—

MR. MCCARTHY: Mm-hm.

THE COURT:—that there is a mental health—I mean it's not a secret—

MR. MCCARTHY: Right, no.

THE COURT:—that there's a mental health issue here. So all of those things, to me—

MR. MCCARTHY: It's—

THE COURT:—suggest that you really ought to be represented.

MR. MCCARTHY: And—and I think so too. I mean, I—I would never have taken this on if I didn't—if I didn't feel that—if I didn't feel that the interests by counsel or—or the—the—the communication was there or there hadn't been previous conflict and continuous conflict. Your Honor, I mean, it started with—well, just—just to address what the—the state mentioned—

. . . .

MR. MCCARTHY: And I mean—and I mean—and that's really a— and that's really a—a good response when you asked me what the testimony—the witnesses were going to testify to, because I hadn't had a chance to interview any of them yet. I didn't know what they were going to say. I knew what I was going to ask. I knew the topics that I was going to inquire about in the scope of my—of my questioning. But as far as what they're going to say, I—

. . . .

MR. MCCARTHY: But—but as far the—as far as the mental health

38

angle and my medication, you know, I didn't ask for it to be upped.

. . . .

THE COURT: This is the last opportunity you will have to get a lawyer, is all I'm—is all I'm saying, because once we start this thing—now, you have the right to represent yourself, but the penalties—

MR. MCCARTHY: May I have a moment?

THE COURT: Of course.

RP (July 15, 2016) at 95-100.

During the July 15 hearing, Matthew McCarthy then asked that Dennis Dressler be reappointed to represent him. The superior court granted the request. At attorney Dressler's request, the court continued the trial date from July 18 to September 19.

On July 21, 2016, Matthew McCarthy filed a declaration with the court that registered his disappointment with the court's denial of his claim that the jail surrounded him with fumes. McCarthy asserted that five witnesses had also experienced the fumes.

Trial proceeded on September 19, 2016. Matthew McCarthy testified on his own behalf. During his direct examination, McCarthy repeated his story of seeing two vehicles parked in front of a home that previously had been parked in front of his house. He approached the home nearest to the parked cars, and a lady, later identified as Kayla Gonzales, opened the door and yelped. She closed the door and McCarthy left without touching her. He returned the following day. He then saw Kayla Gonzales jump from the couch, and a man answered the door. McCarthy asked the man for Laura, McCarthy's ex-wife. The man told McCarthy to leave. McCarthy left, but then noticed he lost his cell phone so he returned to the home a second time that day. When he

returned, two men chased him in his car. The men cornered him at a gas station. McCarthy offered to fight one of the men, if the other man did not enter the fight. Police appeared and arrested McCarthy.

During the trial on the burglary charge, the prosecution extensively cross-examined Matthew McCarthy about the details of his interactions at Kayla Gonzales' home. McCarthy explained that he knocked on Kayla Gonzales' door in order to speak with Laura. He stopped at the home because of the identical cars in front of the house. McCarthy admitted to preventing Gonzales from closing the front door. He claimed Gonzales to be lying when testifying that he shoved her. At the State's request, the trial court struck the accusation of prevarication. During his testimony, McCarthy did not claim that Kayla Gonzales and Laura McCarthy knew each other. He never spoke of a conspiracy against him.

On September 21, 2016, the jury returned a verdict of guilty to the charge of first degree burglary. The trial court sentenced Matthew McCarthy to a life sentence without the possibility of parole.

LAW AND ANALYSIS

On appeal, Matthew McCarthy assigns two errors in the trial court proceedings. First, McCarthy contends the trial court violated his constitutional right to a fair trial when it allowed him to stand trial when good reason emerged to doubt his competency. Second, he argues that the trial court abused its discretion when it neglected to order a

competency evaluation, sua sponte, after information from the State and from him revealed him to be no longer capable to assist his own defense. McCarthy does not contend that his criminal trial counsel performed ineffectively by failing to ask for another competency evaluation. We conflate the two assignments of error and ask whether the trial court, at some stage after the jury finding of competency, had reason to doubt McCarthy's competency and should have directed another evaluation. We answer in the affirmative.

The Fourteenth Amendment to the United States Constitution due process clause proscribes the conviction of a person not competent to stand trial. *Medina v. California*, 505 U.S. 437, 439, 112 S. Ct. 2572, 120 L. Ed. 2d 353 (1992). The constitutional standard for competency is whether the accused has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and to assist in his defense with a rational as well as a factual understanding of the proceedings against him. *Dusky v. United States*, 362 U.S. 402, 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960). Competency is fundamental to an adversary system of justice. *Drope v. Missouri*, 420 U.S. 162, 172, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975). The mentally incompetent defendant, though physically present in the courtroom, is in reality afforded no opportunity to defend himself. *Drope v. Missouri*, 420 U.S. at 171.

Washington implements this due process protection by statute and may provide greater protection to an accused against convictions while incompetent. Chapter 10.77

41

RCW governs the procedures and standards used to adjudge an accused's competency to stand trial under state law. *State v. Wicklund*, 96 Wn.2d 798, 801, 638 P.2d 1241 (1982). RCW 10.77.050 declares:

> No incompetent person shall be tried, convicted, or sentenced for the commission of an offense so long as such incapacity continues.

An accused cannot waive incompetency, presumably because he cannot knowingly waive the immunity from prosecution. *In re Personal Restraint of Fleming*, 142 Wn.2d 853, 615, 16 P.3d 610 (2001).

A Washington statute creates a two-part test in assessing whether an accused possesses the aptitude to stand trial. RCW 10.77.010(15) announces:

> "Incompetency" means a person lacks the capacity to
> [1] understand the nature of the proceedings against him or her or [2] to assist in his or her own defense as a result of mental disease or defect.

If the accused lacks either feature, the State may not proceed to trial. The parties and their experts agree that Matthew McCarthy always understood the legal proceedings. The question arose often during the superior court proceeding as to whether McCarthy could assist his attorney.

The due process clause not only precludes the conviction of an incompetent person but also demands a state to administer a process to determine the accused's competency if questions arise regarding the competency. *Pate v. Robinson*, 383 U.S. 375, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966); *State v. Wolff*, 237 Conn. 633, 678 A.2d 1369, 1387 (1996).

Under Washington procedures, whenever reason emerges to doubt the defendant's

competency, the trial court shall designate a qualified mental health professional to

evaluate the mental condition of the defendant.  RCW 10.77.060(1)(a).  This key statute

declares:

> *Whenever* a defendant has pleaded not guilty by reason of insanity, or *there is reason to doubt his or her competency*, *the court on its own motion* or on the motion of any party shall either appoint or request the secretary [of the Department of Social and Health Services] to designate a qualified expert or professional person, who shall be approved by the prosecuting attorney, to evaluate and report upon the mental condition of the defendant.

(Emphasis added.)  On appeal, Matthew McCarthy argues the court on its own, even after

the jury found him competent, should have found reason to doubt his competency and

appoint another professional to evaluate his condition.

Unless the accused raises an insanity defense, the court need conduct a hearing as

to the accused's competency only on a threshold determination of a reason to doubt the

accused's competency.  *State v. Lord*, 117 Wn.2d 829, 901, 822 P.2d 177 (1991),

*abrogated on other grounds by State v. Schierman*, ___ Wn.2d ___, 415 P.3d 106 (2018)

(Plurality opinion).  Whenever a legitimate question of the accused's competency arises,

the court must hold a competency hearing in accordance with statutory procedures.  *State*

*v. Marshall*, 144 Wn.2d 266, 279, 27 P.3d 192 (2001), *abrogated on other grounds by*

*State v. Sisouvanh*, 175 Wn.2d 607, 290 P.3d 942 (2012); *State v. Lord*, 117 Wn.2d at

901.  "A reason to doubt" is not definitive, but vests a large measure of discretion in the

trial judge. *City of Seattle v. Gordon*, 39 Wn. App. 437, 441, 693 P.2d 741 (1985). No fixed signs invariably require a hearing, but the factors to be considered include evidence of a defendant's irrational behavior, his or her demeanor, personal and family history, past behavior, medical opinions on competence, and the opinion of defense counsel. *State v. Lord*, 117 Wn.2d at 900-04 (1991).

The procedures under RCW 10.77 are mandatory, not merely directory. *In re Personal Restraint of Fleming*, 142 Wn.2d at 863 (2001). Failure to observe procedures adequate to protect an accused's right not to be tried while incompetent to stand trial is a denial of due process. *In re Personal Restraint of Fleming*, 142 Wn.2d at 863.

RCW 10.77.060 further outlines the process of assessing an accused's competency once the trial court finds reason to doubt competency. Under this statute, the accused may hire his or her own expert to evaluate him or her and the accused's expert may witness the court appointed expert's evaluation. If, after receiving the psychological evaluation, the trial court determines the accused to lack capacity, the court may commit the accused to a mental health facility for treatment for the purpose of restoring competency. RCW 11.77.086. The commitment shall not initially exceed ninety days. RCW 11.77.086. The trial court must then conduct another hearing within the ninety days to determine the competency of the accused. RCW 11.77.086(2). If the accused remains incompetent, the court may extend the commitment and treatment another ninety days. RCW 11.77.086(2). Following the second such commitment, if a question of

competence persists, the accused is entitled to a trial by jury on the question of competence. RCW 10.77.086(3).

A jury ruled Matthew McCarthy competent to stand trial, but McCarthy argues that, after the jury determination, his condition deteriorated such that he returned to a state of incompetency. We must determine whether the prior jury ruling precludes McCarthy from later asserting incompetency. We must also ask, if the jury determination does not bar subsequent assertions of incompetency, whether the jury adjudication bears some weight and, conversely, what showing must the accused present to stem further prosecution.

The State does not argue that the jury ruling of competency acts as the law of the case, and we find no decision that holds a jury verdict of competency to bar a later assertion of incompetency. Washington's key statute, RCW 10.77.060(1)(a), directs the court to appoint an expert to conduct a mental health evaluation "whenever" doubt emerges as to the accused's competency. "Delusions are not rigidly fixed, but can fluctuate in intensity over time, even in the absence of treatment." PROF'L TRAINING RES., INC., NOTES ON DELUSIONAL DISORDER 1 (undated), https://www.professionaltrainingresourcesinc.com/wp-content/uploads/Notes-on-Delusional-Disorder.pdf. A defendant's mental state may deteriorate under the pressures of incarceration or trial. *Pieniazek v. State*, 394 P.3d 621, 624 (Alaska Ct. App. 2017). Mental illness can vary in degree over time. *People v. Shinga*, 6 Cal. App. 5th 22, 201

Cal. Rptr. 3d 611, 624 (2016). Since an accused could meander in and out of competency, we should assume that a jury determination of competency can never be final.

Because the competency of a criminal defendant impacts the integrity of the judicial process, a trial court holds the duty to order a competency evaluation whenever good cause emerges to believe the defendant may be incompetent to stand trial. *Pieniazek v. State*, 394 P.3d at 624. A trial court has a continuing duty to monitor whether a defendant's competency should be evaluated. *Schaeffer v. State*, 2012 WY 9, 268 P.3d 1045, 1058 (Wyo. 2012). A defendant's mental incapacity to proceed may be raised at any time by the accused, defense counsel, the prosecuting attorney, or the trial court. *Gilbert v. State*, 1997 OK CR 71, 951 P.2d 98, 106. Once a defendant is declared competent, the trial court must still be receptive to revisiting the issue if circumstances change. *Washington v. State*, 40 Fla. L. Weekly D682, 162 So.3d 284, 289 (Fla. Dist. Ct. App. 2015).

An earlier adjudication of competency bears some consequences. California courts hold that, once a defendant has been found competent to stand trial, a second, or in Matthew McCarthy's case, a third competency hearing is required only if the evidence discloses a substantial change of circumstances or new evidence is presented casting serious doubt on the validity of the prior finding of the defendant's competency. *People v. Mendoza*, 62 Cal. 4th 856, 365 P.3d 297, 320, 198 Cal. Rptr. 3d 445 (2016); *People v.*

46

*Medina*, 11 Cal. 4th 694, 906 P.2d 2, 23, 47 Cal. Rptr. 2d 165 (1995). This California rule looms as the prevailing, if not, universal rule. 21 AM. JUR. 2D Criminal Law § 101 (2018). We adopt the rule.

Our state Supreme Court, in *State v. Ortiz*, 119 Wn.2d 294, 831 P.2d 1060 (1992) (Plurality opinion) primarily addressed other issues. Nevertheless, in passing, the court noted that the trial court conducted a third competency hearing after a second hearing found him competent to stand trial. The trial court refused to consider anew any evidence of incompetency during the third hearing, but instead denied the application to stay proceedings on the basis that Mario Ortiz failed to present new evidence that "altered the *status quo*." *State v. Ortiz*, 119 Wn.2d at 300-01. The Supreme Court announced no principles. Nevertheless, the court affirmed because Ortiz failed to produce "any evidence that his condition had changed since his previous competency hearings." *State v. Ortiz*, 119 Wn.2d at 301. The court implied that the defendant bore a burden of showing a "significant change" in his mental health condition. *State v. Ortiz*, 119 Wn.2d at 301. We deem a substantial change and a significant change the same for purposes of the review of Matthew McCarthy's appeal.

Several foreign decisions recognize the importance of continued monitoring of the defendant's mental health. In *People v. Shinga*, 6 Cal. App. 5th 22 (2016), the reviewing court reversed a conviction for arson because the trial court failed to recognize its discretion to make further inquiry regarding the defendant's competency after one

47

determination of the ability to stand trial. Since the date of the first determination, Gregory Shinga had been diagnosed with schizophrenia and delusions. The defense's presentation of this new evidence raised sufficient doubt as to competency as to require another evaluation.

The federal court in *Maxwell v. Roe*, 606 F.3d 561 (9th Cir. 2010), reversed a conviction because of the trial court's failure to conduct a second competency hearing after once declaring the defendant competent to stand trial. The record showed a substantial deterioration in Clifton Maxwell's mental condition since the competency hearing months earlier.

*People v. Mendoza*, 62 Cal. 4th 856 (2016), promotes the view that a trial judge's observations of the accused are important when the same judge presides over the previous competency trial and then continues to preside over the prosecution when the defense later contends that the accused is no longer competent. In such an event, the trial judge may consider his or her personal observations in determining whether there has been a significant change in the defendant's mental state. The *Mendoza* appellate court ruled that the trial court committed no error when refusing to order another competency evaluation when the trial court noted that the defendant's behavior repeated the behavior the judge observed during the competency trial. The same judge observed Huber Mendoza at every stage of the proceeding.

Matthew McCarthy does not identify a specific date on which the trial court

should have ordered another competency evaluation. Nonetheless, he focuses on three hearing dates in 2016 when signs of his paranoia emerged: May 13, June 24, and July 1. We hold that, based on Matthew McCarthy's behavior on those dates and pleadings filed leading to the hearings, the trial court had reason to doubt McCarthy's competency and should have ordered a new mental health evaluation.

On May 13, 2016, the superior court judge who presided over the competency jury trial entertained Matthew McCarthy's motion to represent himself. The trial judge noted irrational behavior on the part of McCarthy although the judge characterized the behavior as similar to the behavior contemporary to the competency trial. The judge indicated that the court would monitor McCarthy's mental health thereafter, but that judge never presided over another hearing. Other than other judges presiding over later hearings, we know of no further monitoring of McCarthy by the superior court.

We disagree with the superior court judge's comment on May 13, 2016, that Matthew McCarthy's behavior echoed his behavior at the time of the competency trial. The competency trial record shows no contemporaneous delusions in McCarthy. To the contrary, the medical testimony showed treatment had resolved the delusions. Yet, by May 13, two to three months later, McCarthy suffered from delusions similar in nature to the delusions he maintained at a time when the superior court earlier declared him incompetent. By May 13, McCarthy claimed government misconduct. He asserted that his ex-wife worked in the jail mailroom and intercepted his mail and county officials

49

placed a human plant in his jail cell to provide him narcotics. The State's attorney warned that "we're slipping" since the time of the declaration of competency. RP (May 13, 2016) at 715-16.

Through no fault of her own, the superior court judge presiding over hearings on June 24, July 1, and July 15, 2016, had not earlier observed Matthew McCarthy. She could not compare present observations with observations at the time of the competency finding. By June 24, Matthew McCarthy had described in pleadings and during colloquy with the court how, for the last month and a half, correctional officers funneled toxic fumes into his cell and then laughed at him. One coprisoner had attacked him and another had supplied him narcotics. McCarthy had disclosed that he could not prepare for trial because of toxins introduced into the booth where he studied. He had returned to his previous delusion, in which all those who did not concur in his vast-winged conspiracy theory had joined the collusion against him and this collusion denied him effective assistance of counsel. A previous superior court judge had relied on these delusions when ruling that McCarthy could not rationally assist his attorney in preparing for trial. Since those delusions did not appear at the time of the competency trial, a substantial change had occurred in the mental health of McCarthy contrary to the position of the dissent.

By July 15, Matthew McCarthy had returned to his belief that Kayla Gonzales and his ex-wife knew one another. By July 15, the two women, according to McCarthy,

engaged in a romantic relationship. On July 15, the State mentioned its generous offer to save McCarthy from life imprisonment, which offer McCarthy rejected because of his belief he would prevail. Dr. Daniel Lord-Flynn had earlier deemed McCarthy competent in part because McCarthy indicated he would ignore his conspiracy delusions if he received a good plea bargain. This prediction turned false. Contrary to the dissent's comment, McCarthy could not appreciate the ramifications and consequences of the crime charged and the dire consequences he faced on conviction.

The State argues that the record shows no deterioration in Matthew McCarthy's condition after the jury verdict. But the State's comments on the record belie this appellate argument. To repeat, the medical testimony during the competency jury trial showed McCarthy restored to competency in part because he no longer suffered delusions. The State emphasized to the jury that McCarthy was then sane because treatment had rid him of his delusions. On May 13, 2016, the State noted that McCarthy was slipping from the time of the competency trial. The State never contended that McCarthy feigned his delusions. The delusions increased after May 13. The State notes that defense counsel did not question Matthew McCarthy's competence after the competency trial. Yet, during much of the proceedings, in mid-2016, McCarthy did not have counsel. He represented himself. Anyway, the trial court holds the obligation to order an evaluation regardless of whether defense counsel alerts the court to his client's mental incompetency.

The State also emphasizes that the trial court did not question Matthew McCarthy's competence after the jury ruling. Nevertheless, the superior court judge on July 15 expressed concern for McCarthy's capacity, such that the superior court judge told McCarthy he should not represent himself. Concern for the defendant's competency should, however, result in a psychological evaluation, not appointment of legal counsel. RCW 10.77.086 does not state that questions of competency can be resolved by appointing counsel. Because of the constitutional right to assistance of counsel and the inability of counsel to assist when the accused lacks competency, the trial court must take steps beyond allowing the prosecution to proceed to trial when serious questions of competency arise.

The dissent emphasizes the nature of Matthew McCarthy's communications with his appellate counsel. McCarthy attached those communications to his statement of additional grounds. But McCarthy wrote his letters and e-mails more than one year after the first degree assault trial. In the letters, McCarthy complained about the lack of communication from appellate counsel, he expressed his belief that appellate counsel failed to effectively assist him, and he directed counsel to focus the appeal on his claim that law enforcement fabricated evidence against him. The communications prove nothing about an ability of McCarthy to rationally assist his appellate counsel, let alone his earlier trial counsel. McCarthy's complaints to appellate counsel echoed the accusations he asserted against Kari Reardon, at the time the trial court found McCarthy

52

incompetent.

The dissent repeatedly mentions that Matthew McCarthy denies incompetency. The dissent may imply that McCarthy's denial of incompetency poses as a factor in assessing him competent to stand trial. We disagree. We observe that many incompetent individuals insist on their competency. Andrew D. Reisner, Jennifer Piel & Miller Makey, *Competency to Stand Trial and Defendants Who Lack Insight Into Their Mental Illness*, 41 Journal of the American Academy of Psychiatry and the Law 85-91 (2013).

The dissent mentions that this reviewing court lacks the ability to assess factors that bear on a competency determination. In part, we agree. But we do not contend that the reviewing court's role is to determine competency. Instead, we rule that the trial court or jury should have determined competency again when Matthew McCarthy's delusions reappeared. We also conclude that, because of the passage of time, the trial court, like us, will lack the ability to retroactively assess competency during the window of time from May to September 2016.

We in part disagree with the dissent's position that this court cannot assess the factors that bear on a competency determination. The undisputed record shows that the trial court twice found Matthew McCarthy incompetent to stand trial because of his delusions. A jury later found McCarthy competent at a time when the undisputed evidence showed he no longer held his delusions. Finally, the undisputed record shows the delusions that led to a finding of incompetency reappeared months after the jury

53

finding of competency. A reviewing court, based on the undisputed evidence, can readily assess the need to conduct a third competency evaluation. Few cases may better juxtapose the mental health condition of the accused between the times when he was competent and the times when he was incompetent.

We note that the record lacks any entry about Matthew McCarthy suffering delusions at the time of his trial. He testified at trial but did not testify to any conspiracy theories. By its nomenclature, one's competency to stand trial should focus on the condition of the accused during the trial itself. Nevertheless, the State does not argue that, even assuming Matthew McCarthy to be incompetent in May through July of 2016, his ability to assist his attorney was restored by the time of trial. The record contains no mention of McCarthy's mental health condition between July 15 and his trial in late September. The record lacks any indication that professionals between July and September 2016 treated McCarthy such that the reoccurring delusions dissipated.

We also note that at least one reviewing court directed the trial court to engage in a retrospective determination of whether the accused was competent to stand trial at the time of trial or at some date preceding trial. *Pieniazek v. State*, 394 P.3d 621 (Alaska Ct. App. 2017). Nevertheless, the State does not ask for this reconstruction of Matthew McCarthy's condition. Also, the Alaska Supreme Court in *Pieniazek* noted the difficulty in conducting a retrospective competency hearing and allowed the trial court to grant a new trial if the court deemed it difficult to conduct the retrospective hearing. We observe

an additional difficulty of a backdated competency hearing when the trial judge who presided over the competency jury trial did not preside over later hearings or the criminal trial.

The dissent forwards *State v. Ortiz-Abrego*, 187 Wn.2d 394, 387 P.3d 638 (2017), for the proposition that a trial court may conduct a competency hearing after trial. Nevertheless, the facts in *Ortiz-Abrego* vary from the circumstances of Matthew McCarthy's appeal. Immediately after the jury guilty verdict, the defense sought an arrest of judgment or a new trial because Alexander Ortiz-Abrego lacked competency to stand trial. The trial court then sent Ortiz-Abrego to Western State Hospital for an evaluation. The hospital completed the evaluation within months of the trial and the evaluating psychologist found Ortiz-Abrego incompetent. The trial court granted a new trial, and the Supreme Court affirmed the order. Any retrospective evaluation did not occur more than two years later and after the appeal process.

The dissent states that the special procedures of RCW 10.77.086(4) apply such that, instead of this court remanding for a competency hearing, the State must dismiss the charges with prejudice and the court explore a civil commitment of Matthew McCarthy. We disagree. RCW 10.77.086(4) declares:

> For persons charged with a felony, *at the hearing upon the expiration of the second restoration period* or at the end of the first restoration period in the case of a defendant with a developmental disability, *if the jury or court finds that the defendant is incompetent*, or if the court or jury at any stage finds that the defendant is incompetent and the

> court determines that the defendant is unlikely to regain competency, the charges shall be dismissed without prejudice, and the court shall order the defendant be committed to a state hospital as defined in RCW 72.23.010 for up to seventy-two hours starting from admission to the facility, excluding Saturdays, Sundays, and holidays, for evaluation for the purpose of filing a civil commitment petition under chapter 71.05 RCW. The criminal charges shall not be dismissed if the court or jury finds that: (a) The defendant (i) is a substantial danger to other persons; or (ii) presents a substantial likelihood of committing criminal acts jeopardizing public safety or security; and (b) there is a substantial probability that the defendant will regain competency within a reasonable period of time. In the event that the court or jury makes such a finding, the court may extend the period of commitment for up to an additional six months. . . .

(Emphasis added.) Matthew McCarthy's prosecution does not now lie in the posture of a hearing at the end of the second restoration period. The jury did not find Matthew McCarthy incompetent at the conclusion of the second restoration period. Thus, the conditions precedent to the special procedure do not exist.

We note that the Washington court followed this special procedure in *State v. Hurst*, 173 Wn.2d 597, 269 P.3d 1023 (2012). Nevertheless, unlike in Matthew McCarthy's prosecution, the trial court found John Hurst to remain incompetent after the second restoration period.

Matthew McCarthy assigns many errors in his statements of additional grounds. Some of these errors need not be addressed because of our disposition of this appeal. As to McCarthy's claims of falsified evidence, he may assert those claims on remand to the superior court.

CONCLUSION

We vacate Matthew McCarthy's conviction for first degree burglary and his life

sentence. We remand for further proceedings consistent with this opinion.

_____
Fearing, J.

I CONCUR:

_____
Lawrence-Berrey, C.J.

No. 34859-8-III
(consolidated w/ No. 34863-6-III)

SIDDOWAY, J. (Dissenting) — It is well settled that an accused has a fundamental right not to stand trial unless legally competent, a right guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution. *State v. Wicklund*, 96 Wn.2d 798, 800, 638 P.2d 1241 (1982); *Drope v. Missouri*, 420 U.S. 162, 172, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975); U.S. CONST. amend. XIV. I agree with the majority that it necessarily follows that if a previously-competent defendant appears to have become incompetent, a trial court should not proceed with trial without taking steps to protect the defendant's due process rights.

I also agree with the majority's adoption of the California rule that once a defendant has been found competent to stand trial, a further competency hearing is required only if the evidence shows a substantial change of circumstances or new evidence is presented casting serious doubt on the prior finding of the defendant's competency. Slip op. at 46 (citing *People v. Mendoza*, 62 Cal. 4th 856, 365 P.3d 297,

198 Cal. Rptr. 3d 445 (2016)).[1] The rule is stated in terms that differ only slightly from our Supreme Court's holding that absent a "significant change," a prior finding of competency should stand. *State v. Ortiz*, 119 Wn.2d 294, 301, 831 P.2d 1060 (1992) (plurality opinion).

I disagree that Matthew McCarthy's appellate lawyer has demonstrated that the trial court failed to heed evidence that was relevant to a substantial change of competency-related circumstances. I say "Matthew McCarthy's appellate lawyer" because Mr. McCarthy disagrees strongly with her argument on appeal. In a pro se statement of additional grounds (SAG), he shares a history of correspondence with his appellate lawyer identifying different issues he hoped she would raise on appeal. While his issues might not have proved viable, his communication is lucid.

I disagree with the majority's refusal to order a reference hearing when we are in no position to assess many factors that bear on a competency determination—factors the majority ignores. While I would reject the appellate lawyer's competency-based assignment of error, I would order a reference hearing at a minimum.

Finally, I disagree with the majority's implication that following reversal and remand, the trial court can order another competency evaluation.

---

[1] The California rule must be qualified by Washington's statutory dictate that the procedure changes when a defendant has been twice committed for competency restoration, as discussed in section III below.

No. 34859-8-III (consolidated w/ No. 34863-6-III)
*State v. McCarthy; In re Pers. Restraint of McCarthy* (dissent)

I explain my disagreements in the order stated.

I.    MR. MCCARTHY'S APPELLATE LAWYER DOES NOT MAKE THE SHOWING REQUIRED
      BY THE CALIFORNIA RULE THE MAJORITY ADOPTS

"Requiring that a criminal defendant be competent has a modest aim: It seeks to

ensure that he has the capacity to understand the proceedings and to assist counsel."

*Godinez v. Moran*, 509 U.S. 389, 402, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (1993). No

one has contended at any stage of these proceedings that Mr. McCarthy lacks the capacity

to understand the proceedings. *See* slip op. at 42 ("The parties and their experts agree

that Matthew McCarthy always understood the legal proceedings."). It is contended only

that he was unable to assist counsel.

"In order to adequately assist counsel in his defense, an accused should possess an

adequate recall of the factual events involved in the charge against him, be able to

communicate those recollections to his attorney, and have both an intellectual and

emotional appreciation of the ramifications and consequences of the crime charged."

12 WASHINGTON PRACTICE: CRIMINAL PRACTICE & PROCEDURE § 902, at 171 (3d ed.

2004) (citing *State v. Gwaltney*, 77 Wn.2d 906, 468 P.2d 433 (1970)). Mr. McCarthy's

appellate lawyer points to nothing in the record that establishes that he does not possess

an adequate recall of events or is unable to communicate his recollections to his

attorney.[2] The majority opinion fails to identify evidence of a substantial change in Mr.

---

[2] While no fact finding has been done on Mr. McCarthy's dealings with his *trial*

3

McCarthy's appreciation of the ramifications and consequences of the crime charged that should have caused the superior court concern that he was no longer competent.

Instead, the majority focuses on Mr. McCarthy's delusions. The fact that a defendant suffers delusions as a result of his mental illness does not necessarily bear on his ability to assist counsel. In *State v. Lord*, in which a defendant's death sentence was on review, our Supreme Court found no reversible error where the trial court ruled that the defense had not made a threshold showing that a competency hearing was needed despite delusional statements by the defendant. 117 Wn.2d 829, 903, 822 P.2d 177 (1991), *abrogated on other grounds by State v. Schierman*, ____ Wn.2d ____, 415 P.3d 106 (2018) (plurality opinion). The defense presented testimony from a corrections officer that the defendant "told him 'he had a conversation with the Lord and the devil and the devil asked him to drink a cup of his own blood to prove his innocence.'" *Id.* at 901. Lord also asked the corrections officer to handcuff him when he appeared in court because Lord was afraid of what he would do to his attorney. *Id.* As pointed out by the Supreme Court, the trial court had "noted that defense counsel had not made any

---

*lawyer*, review of relevant portions of his SAG suggests that he has a keen interest in the evidence in his case and exhibited a strong desire to communicate with his appellate lawyer. *See* SAG at 1-7, 21-30. As he states in his SAG, "[C]orrespondence shows I had been in contact with counsel since her appointment with all relevant information and more than eager to be of any assistance." SAG at 9.

4

assertion that Lord was unable to recall or relate facts sufficient for defense counsel to proceed." *Id.* at 902.

Mr. McCarthy's appellate lawyer fails to demonstrate facts on the basis of which the trial court should have recognized that Mr. McCarthy's adequate recall of facts, his ability to communicate them, or his appreciation for the ramifications of the charges against him had substantially changed. His mental illness did not, without more, require the court to refer him for a fourth competency evaluation to be followed by a fourth competency adjudication.[3]

II.    EVEN IF PERSUADED THAT FACTS SUGGESTED THAT MR. MCCARTHY HAD BECOME INCOMPETENT, WE SHOULD ORDER A REFERENCE HEARING

A retrospective competency hearing can take place after a defendant is found guilty. Our Supreme Court blessed such a procedure in *State v. Ortiz-Abrego*, 187 Wn.2d 394, 387 P.3d 638 (2017). If a competency hearing can take place posttrial, we can certainly remand for a reference hearing posttrial, to obtain findings on the many factors

---

[3] Mr. McCarthy was referred to Eastern State Hospital (ESH) for a competency evaluation three times. The court obtained ESH's first competency evaluation on December 9, 2014, obtained its second competency evaluation on March 6, 2015, and obtained its third competency evaluation on October 13, 2015. Mr. McCarthy was admitted to ESH for his first competency restoration period on December 22, 2014, and was admitted to ESH for his second competency restoration period on July 20, 2015.

The trial court made the first determination as to Mr. McCarthy's competency on December 11, 2014, and its second determination of his competency on April 24, 2015. As was Mr. McCarthy's prerogative, the third determination as to his competency was made by a jury on January 28, 2016.

relevant to a competency determination. Such a reference hearing is especially necessary in this case, where a jury had found Mr. McCarthy competent and no participant in Mr. McCarthy's September 2016 trial raised a concern that he was incompetent. Defense counsel did not raise a concern about his competence, the State did not raise a concern about his competence,[4] and the trial court did not raise a concern about his competence. To this day, Mr. McCarthy personally insists that he was competent. *E.g.*, SAG at 18 ("Incompetence is not the real issue here.").

Washington courts have compiled a list of factors that the finder of fact is encouraged to consider in determining a defendant's competency. They include "'the defendant's appearance, demeanor, conduct, personal and family history, past behavior, medical and psychiatric reports and the statements of counsel.'" *Ortiz-Abrego*, 187

---

[4] The majority attaches significance to the prosecutor's statement when Mr. McCarthy moved to represent himself that some "non-bizarre delusion[s] . . . might be resurfacing." Report of Proceedings (RP) (May 13, 2016) at 715. But that was in the context of Mr. McCarthy's desire to proceed pro se. And the court said to Mr. McCarthy in response to the State's concern,

> We went through a whole competency trial. You were found to be competent. In listening to you today, you don't sound a whole lot different than you did at the competency trial. You seem to understand the process, the procedure, where you are in this case, and it seems that you have some defense. Whether or not it's a defense that other people would choose is a separate question.

RP (May 13, 2016) at 716.

6

Wn.2d at 404 (quoting *State v. Dodd*, 70 Wn.2d 513, 514, 424 P.2d 302 (1967)). And where a competency hearing takes place posttrial, our Supreme Court held in *Ortiz-Abrego* that the trial court will have the benefit of, and can consider, evidence of the defendant's "actual understanding" during the trial. *Id.* at 402. We lack the information needed to make findings on these factors and it is not our role to make findings. In a reference hearing, the trial court *would* have the necessary information and would play its appropriate role by making findings.

The majority treats some psychological reports and behavior as a sufficient basis for deciding ourselves that Mr. McCarthy was incompetent and reversing his conviction. But experts' reports are not binding on the court; they are only advisory, since the court must apply legal, not medical standards. 12 WASHINGTON PRACTICE, *supra*, § 906, at 175. At a minimum, we should remand the case for a reference hearing before reversing the conviction.

III.  UPON REVERSAL, RCW 10.77.086(3) AND (4) DICTATE PROCEDURES OTHER THAN A FOURTH EVALUATION AND FOURTH COMPETENCY ADJUDICATION

The majority implicitly orders the trial court to refer Mr. McCarthy for a fourth competency evaluation and to conduct a fourth adjudication of his competency, with a view to prosecuting Mr. McCarthy a second time. Its reversal of Mr. McCarthy's conviction on the basis of its finding that he was incompetent at trial follows his commitment for two periods of competency restoration treatment. The legislature has

7

provided in RCW 10.77.086(3) and (4) that special procedures apply to a defendant who is found incompetent following two periods of competency restoration treatment. Washington law implements a defendant's due process protection through the statutory procedures set forth in chapter 10.77 RCW. *State v. Coley*, 180 Wn.2d 543, 551, 326 P.3d 702 (2014). The legislative scheme "recognizes the defendant's interest in being free from involuntary mental health commitment and treatment." *Id.* at 554.

Where a defendant has been subjected to two periods of competency restoration treatment, the charges "shall be dismissed without prejudice, and the court shall order the defendant be committed to a state hospital . . . for evaluation for the purpose of filing a civil commitment petition under chapter 71.05 RCW," unless the court finds that: "(a) The defendant (i) is a substantial danger to other persons; or (ii) presents a substantial likelihood of committing criminal acts jeopardizing public safety or security; and (b) there is a substantial probability that the defendant will regain competency within a reasonable period of time." RCW 10.77.086(4).

The majority points out that the posture of Mr. McCarthy's prosecution is not "a hearing at the end of the second restoration period." Slip op. at 56. Unsurprisingly, RCW 10.77.086(3) and (4) contemplate that trial courts or juries, not appellate courts, will be weighing evidence and finding facts. If the statutory language doesn't quite fit the directives being given by the majority, it is because the majority is injecting this court into a process that belongs in the trial court.

8

The limitation on the number of competency adjudications and periods of competency restoration treatment reflected in RCW 10.77.086(4) exists to satisfy the demands of due process and equal protection articulated by the United States Supreme Court in *Jackson v. Indiana*:

> [A] person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future. If it is determined that this is not the case, then the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant.

406 U.S. 715, 738, 92 S. Ct. 1845, 32 L. Ed. 2d 435 (1972).

Reasonably read, RCW 10.77.086's limits on revolving-door competency adjudications and commitments cannot be avoided by having us order a trial court to do something that it is not statutorily-permitted to do itself.

For these reasons, I dissent.

Siddoway, J.

9